**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| AMELIA INGRAO and ELISABETH PACANA, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>ADDSHOPPERS, INC., NUTRISYSTEM, INC., VIVINT, INC.,<br><br>Defendants. | Case No. 2:24-cv-1022<br><br>CLASS ACTION COMPLAINT<br><br>JURY TRIAL DEMANDED |

## CLASS ACTION COMPLAINT

Plaintiffs Amelia Ingrao and Elisabeth Pacana ("Plaintiffs") bring this class action complaint against AddShoppers, Inc., d/b/a SafeOpt; Nutrisystem, Inc.; and Vivint, Inc. (collectively "Defendants"), on behalf of themselves and all others similarly situated. Plaintiffs make these allegations based on personal knowledge as to their own actions and upon information and belief as to all other matters.

## NATURE OF THE ACTION

1.     Imagine surfing the web and stumbling upon a retailer's website. You view an item and then leave the website without creating an account or providing any personal information. Later that day, you receive an email to your personal email account on behalf of the retailer imploring you to return to the website and purchase the product. But you never gave the retailer your email address. In fact, you never gave the retailer any of your personal information. So how did it get access to your browsing history and personal contact information? The answer is illicit web tracking by a marketing company known as AddShoppers.

1

2.    AddShoppers runs a marketing enterprise that illicitly tracks persons across the internet, collects their personal information without consent, and then uses that information to send direct solicitations—all unbeknownst to the individual. So, for example, if a person creates an account to buy pet food on a retailer's website, and the retailer is part of the AddShoppers "Data Co-Op", AddShoppers surreptitiously captures the information provided to the retailer, tracks the person's web browsing across the internet, and then uses their information to provide targeted advertisements to the individual on behalf of members of the Data Co-Op.

3.    AddShoppers calls its "marketing" program "SafeOpt." It markets SafeOpt as a service consumers can voluntarily opt into to "receive verified offers from SafeOpt's brand partners." But the reality is very few individuals voluntarily opt into this program. Instead, they are unwittingly captured in it when they create an account and make a purchase on a website that—unbeknownst to them—is part of the AddShoppers' Data Co-Op. As the Data Co-Op grows, so does its dossier on unconsenting targets. Of course, AddShoppers has a financial incentive to market this way: it takes a cut of every purchase made via an unauthorized solicitation.

4.    Hundreds of individuals have complained online about receiving targeted emails from retailers "via SafeOpt" who they never provided with their personal information. "*Creepy*", "*sleazy*", "*disgusting advertising*", "*unethical*", and an "*invasion of privacy*" are just a few snippets of the public commentary condemning this unconsented and ultra-invasive marketing practice.

5.    It is also illegal. AddShoppers and members of the Data Co-Op are violating Pennsylvania's wiretap statute and other state laws intended to protect individuals' privacy rights. This case seeks redress for these violations.

## **PARTIES**

6.      Plaintiff Amelia Ingrao is a resident and domiciliary of Fresno, California.

7.      Plaintiff Elisabeth Pacana is a resident and domiciliary of Philadelphia, Pennsylvania.

8.      Defendant AddShoppers, Inc. is a Delaware corporation with its principal place of business at 15806 Brookway Dr. Suite 200, Huntsville, NC 28078. AddShoppers does business throughout Pennsylvania and the entire United States.

9.      Defendant Nutrisystem, Inc. is a Pennsylvania corporation with its principal place of business at 600 Office Center Dr., Fort Washington, Pennsylvania 19034. Nutrisystem does business throughout Pennsylvania and the entire United States and participates as a member of AddShoppers' Data Co-Op.

10.     Defendant Vivint, Inc. is a Delaware corporation with its principal place of business at 4931 North 300 West, Provo, Utah 84604. Vivint is registered to do business in Pennsylvania and participates as a member of AddShoppers' Data Co-Op.

## JURISDICTION AND VENUE

11.      This Court has subject matter jurisdiction over this lawsuit under the Class Action Fairness Act, 28 U.S.C. § 1332(d), because this is a proposed class action in which: (1) there are at least 100 class members; (2) the combined claims of class members exceed $5,000,000.00, exclusive of interest, attorneys' fees, and costs; and (3) Defendants and at least one class member are citizens of different states.

12.     This Court has general personal jurisdiction over Nutrisystem because it is headquartered in this State.

13.     This Court has personal jurisdiction over AddShoppers because it has purposefully availed itself of the laws and benefits of doing business in this Commonwealth, and Plaintiffs' claims arise out of each of the AddShoppers' forum-related activities. AddShoppers intentionally installed the wiretaps at issue. It purposefully intercepted electronic transmissions from users of the websites. The conduct also was expressly aimed at Pennsylvania residents. AddShoppers knew that a significant number of Pennsylvanians would visit its partner websites because they form a significant portion of both companies' target market. By intercepting the transmissions of the websites' users, AddShoppers targeted their wrongful conduct at customers they knew were residents of Pennsylvania. It was foreseeable that Defendants' interceptions and wiretapping would harm Plaintiffs and similarly situated individuals who resided in Pennsylvania.

14.     AddShoppers already partners with many Pennsylvania companies' websites. And it sends thousands (if not millions) of targeted emails to Pennsylvania. Simply put, a substantial portion of the events giving rise to Plaintiffs' claims occurred in this District.

15.     This Court has personal jurisdiction over Vivint because it is an "active" corporation in the Commonwealth of Pennsylvania with a registered agent in Harrisburg, Pennsylvania.

16.     This Court also has personal jurisdiction over Vivint because it has purposefully availed itself of the laws and benefits of doing business in this Commonwealth, and Plaintiffs' claims arise out of each of the Vivint's forum-related activities. Vivint intentionally installed the wiretaps at issue. It purposefully intercepted electronic transmissions from users of the websites. The conduct was also expressly aimed at Pennsylvania residents. Vivint offers installation of its

home security system throughout the Commonwealth, specifically advertising its services to Pennsylvanians on its website.[1]

17.    Venue is proper in this District because a substantial part of the events or omissions giving rise to the claim occurred in this District.

## STATEMENT OF FACTS

### A.  SafeOpt: Track and Conquer

18.    AddShoppers advertises its SafeOpt service two ways: one is to shoppers, and another is to businesses.

19.    To shoppers, SafeOpt is held out as "free service that sends you Verified Offers while you shop from thousands of participating brands to help save you time & money. We've designed SafeOpt® to protect your data and give you control over your information."[2]

20.    To the few people that opt into the service, AddShoppers says: "When you enter your email and join SafeOpt®, our technology makes note of the device you're using and generates a secure anonymous ID. When one of our brand partners that also has our technology installed on their website sees your device, they know to show your ID promotions and offers not generally available to the broader public. No more (expired!) promo code hunting and things to install -- just a seamless shopping experience with delightful surprises for you!"[3]

---

[1] *Home Security Systems Pennsylvania*, available at
https://www.vivint.com/locations/pennsylvania (last visited February 29, 2024).
[2] *SafeOpt Homepage*, available at https://www.safeopt.com/ (last visited February 29, 2024).
[3] *SafeOpt Frequently Asked Questions*, available at https://www.safeopt.com/ (last visited February 29, 2024).

21.    To businesses, AddShoppers claims SafeOpt offers the opportunity to "send 3-5x more emails to shoppers who abandon your website" by "using our list of 175M+ U.S. shoppers."[4]

22.    The SafeOpt website provides case studies for various industries touting the success of its "track and conquer" program. For example, it states that: "This travel client's results are from 12 months of their SafeOpt Email campaign. They generated $4.8M in revenue from lost shoppers and sent 965.3K emails in just one year with their SafeOpt campaign."

**Campaign**

SafeOpt can help brands reach more interested shoppers and optimize their website's traffic. Through SafeOpt's network of 175M+ online shoppers, brands like this leading travel client can send 3-5x more emails to their interested shoppers. SafeOpt's shoppers also have a history of directly engaging with and purchasing from the brand's eCommerce sites, not just Expedia or Kayak.

---

[4]    *SafeOpt by AddShoppers Intro*, available at https://calendly.com/d/cft-zy7-gz2/safeopt-intro?month=2022-11 (last visited February 29, 2024).



23.    For a food and beverage client, SafeOpt touted sending 134,000 emails over a 12-month period "to lost shoppers with a 14% post click conversion rate." For a jewelry client, SafeOpt sent 681,000 emails over a 12-month period, resulting in $17.9 million in additional revenue.





24. AddShoppers touts SafeOpt's "network with 2,000+ large brands and publishers" including companies like Everlast, Maui Jim, Blue Nile, Sierra, Warby Parker, Gopuff, Nutrisystem, and Goop.

**B. SafeOpt: The Wiretapper**

25. While AddShoppers paints a benevolent picture of SafeOpt's advertising prowess, the terms and conditions AddShoppers imposes on its partner business detail a much more invasive and sinister operation.

26. AddShoppers requires its partner brands to share their "User Data" with AddShoppers, which includes "data collected by SafeOpt technology … related to such Authorized

Users' web browsing as a result of services rendered to you, as well as user opt-in consent to share the User Data with SafeOpt."[5]

27.     AddShoppers further requires participation in a "Data Co-op" which permits SafeOpt to "leverage[] a shared pool of user data collected by SafeOpt technology" by granting "SafeOpt with a limited, transferable license to their User Data to for the purpose of providing identity resolution and direct messaging services for each Data Co-op member's audience."[6]

28.     AddShoppers' terms also permit it to collect all "Client Data" derived from its partner companies, including their customers' User Data, and states that "SafeOpt may exploit Client Data for any lawful purpose without any duty of accounting or compensation to you."[7]

29.     And exploit it does. AddShoppers surreptitiously collects and pools the sensitive personal information provided by individuals to online retailers in confidence, creates dossiers on those individuals, and then tracks them across the internet to monitor their web browsing for its own financial benefit.

30.     While AddShoppers' terms and conditions reference being granted a license to collect the personal information of its partner companies' customers (what AddShoppers defines as "authorized users")—the reality is the *users themselves* never authorized their data to be shared this way. Indeed, they had no idea that while buying a product their information was surreptitiously being transmitted to a company granting itself free rein to "exploit" their information as it chooses.

---

[5] *SafeOpt Terms of Use Effective Date: May 12, 2021*, available at https://www.safeopt.com/terms (last visited February 29, 2024).
[6] *Id*. at Data Co-Op.
[7] *Id*. at Client Data.

31.    In an interview about its business, AddShoppers co-founder Chad Ledford

described the operation of the Data Co-Cop as follows:

> [Chad Ledford]: Yeah, so there's kind of two data sources that we have. One is a
> blind Co-Op, which I would say half of our clients are participating in that, and the
> blind Co-Op is the brands submitting data into it in exchange for being able to use
> the data that comes out of it to activate the campaigns. We don't sync data, we don't
> actually put data into another system, it's all self-contained within our system, but
> about half of the volume that we see comes from that Co-Op of data.
>
> And then the other half comes from publisher relationships that we have where we
> license the data, and again, we don't sell data, or we don't push data out of it so that
> users can still control all their data, but it gives us additional scale so that we can
> start to match who these people are.
>
> [Interview host]: That's awesome. Was there any hesitancy with the brands sharing
> their data initially, or is it a little bit easier once they heard that other brands you
> were working with were already doing that?
>
> [Chad Ledford]: Yeah, we offer both. If they want access to the Co-Op data, they
> have to be part of it, so they have to submit to get access to it, that's basically what
> makes it the Co-Op. So, they can still work with us, and they can still tap into that
> publisher data, and **a lot of the enterprise brands that we work with will never
> submit any data to any other system including us, and it's just off the table,
> it's not going to get through legal.** We can still work with those brands, we just
> do it through our licensed publisher data. But the thing that gets us really excited is
> that idea of the Co-Op, and the brands being able to work together to do more
> together.[8]

32.    In other words, AddShoppers operates a "data lake" where it collects as much

information relating to a user as possible all from different sources, stores that information in a

centralized location where it matches data points and creates detailed profiles on individuals, and

then uses those profiles to send direct, targeted advertisements from Co-Op companies even when

---

[8] Mission.org Podcast, *Diversifying To Become Future-Proof with Chad Ledford, Co-Founder of
AddShoppers*, available at https://mission.org/up-next-in-commerce/diversifying-to-become-
future-proof-with-chad-ledford-co-founder-of-addshoppers/ (emphasis added) (last visited
February 29, 2024).

the user did not authorize it. Ledford suggested that the company intends to collect and utilize even more personal information like "gender data" and "demographic data" as the company continues to grow.[9]

33.     Central to AddShoppers' data collection operation is its use of malicious, third-party tracking cookies. Cookies are small text files that are stored on a user's computer or mobile device by a website. They are used to save information about the user's browsing activity, such as login information, shopping cart contents, and browsing history.[10]

34.     But not all cookies are created equal. A first-party cookie is created and stored by the website the user is visiting, also known as the host domain. It allows the website to collect customer analytics data, remember language settings, and carry out other useful functions that help provide a positive user experience. This means the browser can remember key pieces of information, such as which items added to shopping carts, username and passwords, and language preferences. These are generally considered necessary and helpful cookies.[11]

35.     Third-party cookies, by contrast, are those created by domains other than the one the user is visiting. These cookies are accessible on any website that loads the third-party server's code. Because they can be accessed by multiple domains, third-party cookies can be used to track a user's browsing activity across multiple websites.

---

[9] *See id.*

[10] Cloudfare, *What are cookies*, available at: https://www.cloudflare.com/learning/privacy/what-are-cookies/ (last visited February 29, 2024)

[11] Clearcode, *What's the Difference Between First-Party and Third-Party Cookies?*, available at https://clearcode.cc/blog/difference-between-first-party-third-party-cookies/#first-party-cookies (last visited February 29, 2024).

36.     Companies that join the Co-Op agree to install AddShoppers' code on their website. When an internet user creates an account or makes a purchase with the business, a third-party tracking cookie is created that includes a unique value AddShoppers associates with that user. The cookie is hidden on the user's browser and automatically sends information to AddShoppers' SafeOpt domain "shop.pe." AddShoppers then associates that unique value with the personal information the user provided to the company, which typically includes, at a minimum, full name, address, payment card information, and email address.

37.     With the tracking cookie hidden in the user's browser, AddShoppers can monitor the user's browsing activity across the internet. If the user lands on another website in the SafeOpt network, the cookie values "sync" and AddShoppers tracks the user's activity on the website, including the user's detailed referrer Uniform Resource Locator ("URL"). Because AddShoppers already associates personal information with the cookie value, it can directly advertise to the user even where the user leaves a website without affirmatively providing any personal information.

38.     While companies often use "browser-abandonment" emails to encourage customers to return to their website and purchase a product they put in their cart but never purchased, the companies do so for users who have *already provided the company with their email address*. Likewise, when marketing companies use "cookie synching" to provide targeted advertisements (think searching online for a pair of shoes and later seeing those shows in an advertisement on your browser), the cookie value they use is an anonymized identification number that is not associated with any personally identifiable information ("PII") tied back to the user.

39.     AddShoppers, by contract, *intentionally associates* PII with the unique cookie value assigned by AddShoppers, the basis for its entire business model. In fact, in a now deleted blog post, AddShoppers describes its use of unsolicited, targeted emails to increase sales:

**Send 2x-5x more personalized triggered emails with incremental campaigns.**

**The Problem** Marketers are unable to send email reliably to customers that have not provided their email previously. This means more than 95% of your web visitors cannot receive a relevant email from you.

**The Solution** Connecting the AddShoppers network of 150M+ shoppers through its Email Retargeting® Co-op, marketers are able to resolve identities and deliver 1:1 email regardless of customer email acquisition.

**How it works** Today, if 100 customers visited your website — between your ESP [email service provider], CRM [customer relationship management], and other platforms — you might be able to send a browse abandon or cart abandon email to 4-5 of those site visitors. What about the other 95 visitors? Without AddShoppers your only option is retargeting ads, which continue to get more and more expensive.

With AddShoppers, our system will attempt to match the 95 visitors in real-time against our network of 150M+ monthly profiles and 5,000+ websites. If the visitor leaves your site without signing up for email or buying AND we find a match, AddShoppers will enable a triggered email sequence to help you win back those customers and engage them in a way you can't today.



**Browse + Product Abandon Reminders** A customer is shopping in your catalog as a guest (no sign-in required) and leaves the site without adding a product to shopping cart. Send them the products or content they were looking at directly to their inbox. This typically doubles the performance you're getting from dynamic retargeting ads.

**Active Cart Abandon Reminders** A customer is shopping on a website as a guest and leaves the cart without checking out. With our email retargeting, the marketer can send a personalized

and timely communication to the consumer in a more direct medium, redirecting the consumer back to the site to complete the purchase.[12]

40.     AddShoppers co-founder Chad Ledford also confirmed in an interview that AddShoppers' business model hinges on its ability to send targeted emails to individuals who never voluntarily provided their email address to a member of the Data Co-Op:

> [Chad Ledford]: Yeah so, most digital commerce brands realize the value of email today, especially whenever it comes to retention and lifetime value. So, the conversations are a little bit easier now because they understand that it is a really strong channel, and it's one that they have to defend, but most brands can only tap into what's considered first party data. So, first party data is data that the brand captured themselves. So, a lot of people build up emails from popups, or they capture it during the checkout process or things like that, but that usually ends up being anywhere from like three to 5% of their traffic that they've spent a lot of money to get to their site that they're actually able to capture, and be able to continue creating that relationship with them.
>
> **So, the problem that we help solve today is tapping into that other 95% of people that are on the website, people that haven't given them their email address yet, but they're still showing a lot of engagement, and they probably still want to try to get those people to be their customers**.
>
> [Interview host]: **Got it, so the people who are just casually browsing, or maybe added something to the cart and then left, the people like that who didn't directly give the brand their email, but maybe seemed kind of interested**.
>
> [Chad Ledford]: **Yep, exactly**.[13]

41.     AddShoppers typically solicits in the form of a direct email from the retailer "via SafeOpt" imploring a user to return to the website to purchase a product they were looking at, even

---

[12] *Wayback Machine Screen Capture*, available at: https://web.archive.org/web/20200710211126/https://www.addshoppers.com/blog/email-retargeting-co-op (last visited February 29, 2024)

[13] Mission.org Podcast, *Diversifying To Become Future-Proof with Chad Ledford, Co-Founder of AddShoppers*, available at https://mission.org/up-next-in-commerce/diversifying-to-become-future-proof-with-chad-ledford-co-founder-of-addshoppers/ (emphasis added) (last visited February 29, 2024).

though the individual never gave their email address to the retailer or authorized such communications. Of course, AddShoppers does this with a pure profit motive as it takes a cut of all sales made "via affiliate links in emails, texts, apps, and content."[14]

42.     A software engineer who authored a blog post criticizing AddShoppers' marketing practices offered the following analogy: "Imagine if every store you visited would take a picture of you and then share and compare it with neighboring stores until they find one that you are a customer of and has your information. If such an agreement was in place, that store would now share who you are with the store that you are not yet a customer of and then add you to their marketing list. This is exactly what 'AddShoppers' does."[15]

43.     AddShoppers' illicit tracking practices have been broadly condemned. Below are just a small sample of user complaints over the company's privacy practices.



---

[14] Email Retargeting Strategies for e Commerce Brands, available at https://www.safeopt.com/learn/email-retargeting-strategies-for-ecommerce-brands (last visited February 29, 2024)

[15] Heshie Brody, *I Was Emailed after Abandoning a Registration Form. I Did Not Click Submit. This Is Not Ok* (June 1, 2020), available at: https://dev.to/heshiebee/i-was-emailed-after-abandoning-a-registration-form-i-did-not-click-submit-this-is-not-ok-a63 (last visited February 29, 2024).



**Jay | Gay | Shirtless everyday**
@shirtlessjay                                    ···

Was looking into webcam I heard about, browsed a site for a minute, never gave my email, and never put anything in my cart. Two minutes later, I get this email.

I had never heard of SafeOpt before, but let me tell you, if you want me to NEVER buy your product, do this bullshit.



**mia.** ✨
@miaimarshall                                    ···

how tf is SafeOpt legal? after visiting a website, not opting into anything, and not entering any info, I was sent a marketing email for that site via SafeOpt. companies should NOT be using this.



**lex**
@lexuhz                                          ···

i browsed a website for 3 minutes and somehow they got my email and subscribed it without me even signing up bc of something called "safeopt" wtf



**Luke Hutchison** 🔯
@LH                                              ···

New level of creepy overreach: I just clicked on an ad, read the information on the site, and decided not to buy. I did not enter any information into the site. However they somehow disambiguated my identity, and pushed an email to my email address while I was viewing the site.









**Derek Yang**
@mrderekyang                                    ...

Same here. Watched a YouTube video from
@BBQ_Guys & checked their website, did not fill any
form or leave my email anywhere, somehow they got
my email address & sent me this follow up. Have
blocked anything from bbqguys or safeopt in Gmail;
blocked their YouTube channel as well.

**Anne Hogan**
@Anne_Hogan                                     ...

I was on the @DylansCandyBar website a few hours
ago. 30 min ago I got an email from SafeOpt on behalf
of Dylan's with a 15% offer and I CANNOT STRESS
HOW NOT OKAY THIS IS.

Retargeting ads weren't annoying enough? Will
someone be at my door in another hour?

**Debra Ohayon**
@debraohayon                                    ...

@ChiliSleep please stop using Safeopt as a marketing
email tool. I was sent unasked for emails without even
shared my email address with you. It's creepy, an
invasion of privacy, and has completely put me off of
purchasing your product.

44.    AddShoppers' Better Business Bureau webpage is also flooded with complaints

from individuals who received unsolicited email advertisements from SafeOpt.[16] For example, one

review reads: "I understand what they are doing is 'legal' but it is shady and misleading. I received

---

[16]    *See Better Business Bureau Customer Reviews, AddShoppers*, available at:
https://www.bbb.org/us/nc/huntersville/profile/digital-marketing/addshoppers-0473-
307901/customer-reviews (last visited February 29, 2024).

a marketing re-targeting email from a company I never gave my email to and saw it was connected to 'SafeOpt' (another purposefully misleading name to include the word 'safe'). I should have control over who has my email. It should not be possible to opt into SafeOpt's ENTIRE NETWORK OF ADVERTISERS just by opting in on ONE of them. Brands should be ashamed to use this service, it is bad for my personal data and it is bad for data security."

45.    AddShoppers' standard response to these complaints is to place blame on partner members of the Data Co-Op ("*We emailed on behalf of the sites you visited shown in the email. That was based on the [partner] site['s] settings and its privacy policy*"); refer to its tracking as industry standard ("*Many websites review who['s] visiting, and try to engage with visitors*"); and encourage the use of privacy technology to block SafeOpt's *own* tracking cookies ("*Consider using a VPN + adjusting your browser settings for more anonymity online.*").[17]

| AddShoppers Response | 11/08/2022 |
| --- | --- |
| We emailed on behalf of the sites you visited shown in the email. That was based on the sites settings and its privacy policy. The emails are intended to be helpful (i.e., provide site offers, discounts, etc.), but the email address you provided has now been unsubscribed.  Many websites review whos visiting, and try to engage with visitors. Consider using a VPN + adjusting your browser settings for more anonymity online. | |

46.    The consequences of this type of tracking are serious. Among many other privacy concerns, SafeOpt's network of businesses includes companies that sell highly personal products, including feminine hygiene and men's health products. As a result, SafeOpt can reveal exceptionally private information about customers to anyone that shares a computer. The software engineer who authored the blog post criticizing AddShoppers noted that he received an email to

---

[17] "VPN" stands for "virtual private network" which is a service that encrypts a user's activity on the internet and keeps their identity hidden while browsing.

his personal account imploring him to return to buy a breast pump even though he never provided his information to the website.[18] Another internet user received emails about from a colon cleansing company after he visited the website without providing any personal information.



47.    Other victims report having received unsolicited emails revealing their *partner's* browsing history or had their personal browser history sent to their *work* email address.

---

[18] Heshie Brody, *I Was Emailed after Abandoning a Registration Form. I Did Not Click Submit. This Is Not Ok* (June 1, 2020), available at: https://dev.to/heshiebee/i-was-emailed-after-abandoning-a-registration-form-i-did-not-click-submit-this-is-not-ok-a63 (last visited February 29, 2024).



**libby watson** ✔
@libbycwatson

my husband just got a marketing email saying "thanks for visiting our website" from a website that *I* visited on my computer (didn't enter any information either). feels like a new frontier in shitty internet privacy practices



**Joe Rosensteel** 🏳️‍🌈
@joesteel

@goop My boyfriend was browsing your website earlier and *I* received a spam email from some company called SafeOpt with his shopping history. I never went to your site, but this unethical company you contract with somehow has my email address and matched it to our IP address.



Melissa N
★☆☆☆☆                                                    08/26/2022



I visited a site and that night a solicitation was sent to my work email address. I didn't fill out any forms or provide my email address anywhere. I was simply browsing. SafeOpt/AddShoppers is so invasive and unethical. I'll never buy ANY products or services from any company that uses this service. I assume they are as shady as SafeOpt if that's how they get customers. I'll be installing better controls on my browser to keep these vultures away.

48.     When users receive an email from a retailer "via SafeOpt"—they are purportedly given the option to unsubscribe from such emails (even though they never subscribed to begin with). But when users try to do so, they are not actually removed from the SafeOpt network and continue to receive marketing emails from AddShoppers.

21



**Emily**
@emlevinnn

...

This company sends me emails on behalf of websites I do not opt in to receiving communications from. And I've now tried about 8 ways to opt out of "safeopt" and nothing. safeopt.com



Adam T

⭐☆☆☆☆                                                    06/14/2022

Company spams businesses with email, even after repeated requests to stop. Sends directly to the *** after being told to stop correspondence. They pretend to not know that emails have been received demanding a cessation to personal emails that solicit more business. Unethical, unprofessional.

49.    When individuals go directly to SafeOpt's website and attempt to opt-out or delete

their data, they are met with similar resistance.



Lauren L

⭐☆☆☆☆                                                    07/22/2022



Similar to other reviewers, I was confused about getting a marketing email after browsing a company's website without having volunteered any of my information or adding products to a cart. I immediately unsubscribed and then clicked "Manage Your Preferences" at the bottom of the email--this took me to a page where I had to enter my email address, and instead of being directed to a place to manage my preferences I had to verify my email address, then wait for "another email" that never arrived. Sure it's frustrating to know that my email was added to this "service" without my knowledge or consent, but in any other similar circumstance I've been able to opt in a few clicks with no hassle. What really makes me angry about this is the false assurance that I can "View, download, or delete your data and opt-out at any time": https://www.safeopt.com/manage How is the BBB rating pending an A+?! This company's behavior is unbelievably unethical.





CHRIS L
⭐☆☆☆☆                                    03/21/2022

WOULD GIVE THIS A NEGATIVE 10 STARS IF I COULD GET ME OUT OF THIS DAMM DATABASE.
COMPLETELY OUT. UNBELIEVABLY UNDERHANDED, DO NOT WANT ANY OF MY DATA IN YOUR
FILES WHATSOEVER!! I NEVER GAVE PERMISSION FOR YOU TO EVEN HAVE MY EMAIL, MUCH LESS
SEND ME C*** SAFEOPT'S METHOD TO 'DELETE' YOUR DATA DOESN'T WORK. WTH? HOW CAN THIS
EVEN BE LEGAL??

50.     Under the California Consumer Privacy Act, businesses like AddShoppers are required to disclose what personal information they collect and share about California citizens. Specifically, California citizens can request: (1) the categories of personal information collected; (2) specific pieces of personal information collected; (3) the categories of sources from which the business collected personal information; (4) the purposes for which the business uses the personal information; (5) the categories of third parties with whom the business shares the personal information; and (6) the categories of information that the business sells or discloses to third parties. *See* Cal. Civ. Code § 1798.110.

51.     But upon formal request, AddShoppers refuses to provide this information. Instead, it simply directs those inquiring to a general disclosure in its privacy policy stating that it collects every type of data imaginable.

52.     Thus, AddShoppers refuses to abide by opt-out requests and refuses to disclose on an individual-level basis what information it collects and who receives it. When individuals try to request a download file of their data from AddShoppers, they are sent a text file that may include their email address and certain Co-Op websites time stamps but omits the vast amount of additional information AddShoppers collects. Consequently, even after users learn their data is being misused

by AddShoppers, they still have no recourse to learn how AddShoppers used it historically and will use it going forward.

53.     AddShoppers' prized list of hundreds of millions of U.S. shoppers[19] was not gained through voluntarily consent. Unwittingly, shoppers become part of AddShoppers' SafeOpt network without ever signing up for the service; instead, "joining" SafeOpt by making a purchase from a company participating in AddShoppers' Data Co-Op and having their information traded without their knowledge and consent.

54.     Not only are AddShoppers' marketing and tracking practices unsavory, but they are also illegal. As deployed, AddShoppers' tracking software functions as a wiretap.

*Plaintiff Amelia Ingrao*

55.     On January 27, 2024, Plaintiff Ingrao visited Nutrisystem. She had never visited Nutrisystem before and never provided any personal information to that company.

56.     During that visit, SafeOpt tracked Plaintiff Ingrao's precise webpage visit.

57.     Later that evening, Plaintiff Ingrao received an email to her personal email account from "Nutrisystem via SafeOpt" email account nutrisystem@mail.safeopt.com.

58.     Plaintiff Ingrao was shocked that her personal browsing history was now being sent to her by a company she never provided her email address.

59.     Prior to receiving this email, Plaintiff Ingrao never heard of SafeOpt and never agreed to provide AddShoppers her information for the company to "exploit" for its own financial benefit. After she received the email, Plaintiff Ingrao requested her data from AddShoppers and

---

[19] AddShoppers has recently claimed that has a "growing list of 250 million online shoppers and over 15,000 merchant brands."

discovered she had been tracked by many companies for several years. Plaintiff Ingrao understands her personal information has value and refuses to sign up for any similar online advertising company unless it provides compensation for her information.

60.     Plaintiff Ingrao never agreed to the terms and conditions for either AddShoppers or Nutrisystem.

### Plaintiff Elisabeth Pacana

61.     On February 22, 2024, Plaintiff Pacana visited the website of a retailer called Lamin-x.  She had never visited the retailer's website before and never provided any personal information to the company.

62.     During that visit, SafeOpt tracked Plaintiff Pacana's precise webpage visit.

63.     She later received an email to her personal email account from "Lamin-x via SafeOpt" email account [laminx@mail.safeopt.com](mailto:laminx@mail.safeopt.com).

64.     Plaintiff Pacana was shocked that her browsing history was being emailed to her personal email address by a company she never provided it to.

65.     Prior to receiving this email, Plaintiff Pacana never heard of SafeOpt and never agreed to provide AddShoppers her information for the company to "exploit" for its own financial benefit.

66.     After she received the email, Plaintiff Pacana requested her data from AddShoppers and discovered she had been tracked by at least a dozen companies for several years, including the exact dates and times she visited other websites that (unbeknownst to her) were part of the AddShoppers network. One such website was Vivint, which surreptitiously captured information about Plaintiff Pacana's visit to its website on January 24, 2023. Although she never provided

personal information (including her email) to Vivint, the company carefully tracked her visit and sent information back to AddShoppers to be included in the Data Co-Op.

```
vivint_com:
    email campaigns:
    - date entered campaign: '2023-01-24T20:49:30.860000+00:00'
      last status change: '2023-01-24T20:49:30.860000+00:00'
    last visit: '2023-03-10T18:45:58.213000+00:00'
```

67.     Defendant Vivint is often alleged to use unfair practices to acquire new customers. The Federal Trade Commission fined Vivint $20 million for "allegedly using credit reports fraudulently to help unqualified customers obtain financing for its products."[20] Daniel Kaufman, then-acting director of the FTC's Bureau of Consumer Protection, said, "Vivint's sales staff stole people's personal information to approve others for loans."[21] He added that "[f]or misusing consumer credit reports and other sensitive data, and harming people's credit, [it] will pay $20 million."[22] Vivint also agreed to a consent judgment with Arizona Attorney General.[23] "The consent judgment resolve[d] claims that Vivint made false representations to induce consumers to sign a contract with Vivint."[24]

68.     Plaintiff Pacana never agreed to the terms and conditions for AddShoppers, Lamin-x or Vivint.

---

[20] Sara Tabin, *Vivint reaches $20M settlement with FTC over allegations of fraudulent use of credit reports*, The Salt Lake Tribune (April 29, 2021), available at https://www.sltrib.com/news/2021/04/29/vivint-reaches-m/ (last visited March 2, 2023).
[21] *Id*.
[22] *Id*.
[23] AG Brnovich Reaches $400,000 Consent Judgment with Home Security Company, (March 11, 2022), available at https://www.azag.gov/press-release/ag-brnovich-reaches-400000-consent-judgment-home-security-company (last visited March 2, 2024).
[24] *Id*.

69.     Plaintiffs each had their PII collected by AddShoppers and their online internet browsing monitored and tracked by AddShoppers without their consent. Plaintiffs and class members each have an interest in controlling how their PII is used and shared. Their information has independent value, which is recognized by AddShoppers and members of the Data Co-Op who agree to collect and trade it for their personal gain. Plaintiffs and class members are harmed every time their PII is used or shared in a manner to which they did not consent, particularly when it is used to solicit them for marketing and advertising purposes.

70.     Plaintiffs and class members seek to recover the value of the unauthorized access to their PII resulting from Defendants' wrongful conduct. This measure of damages is analogous to the remedies for unauthorized use of intellectual property. Like a technology covered by a trade secret or patent, use or access to a person's personal information is non-rivalrous—the unauthorized use by another does not diminish the rights-holder's ability to practice the patented invention or use the trade-secret protected technology. Nevertheless, a plaintiff may generally recover the reasonable use value of the IP—*i.e.*, a "reasonable royalty" from an infringer. This is true even though the infringer's use did not interfere with the owner's own use (as in the case of a non-practicing patentee) and even though the owner would not have otherwise licensed such IP to the infringer. A similar royalty or license measure of damages is appropriate here under common law damages principles authorizing recovery of rental or use value. This measure is appropriate because (a) Plaintiffs and class members have a protectible property interest in their PII; (b) the minimum damages measure for the unauthorized use of personal property is its rental value; and (c) rental value is established with reference to market value, *i.e.*, evidence regarding the value of similar transactions.

## CLASS ACTION ALLEGATIONS

71.    Plaintiffs repeat and reallege all preceding paragraphs.

72.    Under Federal Rule of Civil Procedure 23, Plaintiffs assert claims on behalf themselves and the following proposed class and subclasses:

> All persons who had their personal information collected by AddShoppers and whose online activity was tracked by AddShoppers ("Class").

California Subclass:

> All California residents who had their personal information collected by AddShoppers and whose online activity was tracked by AddShoppers ("California Subclass").

Pennsylvania Subclass:

> All Pennsylvania residents who had their personal information collected by AddShoppers and whose online activity was tracked by AddShoppers ("Pennsylvania Subclass").

73.    The proposed classes expressly exclude persons who directly enrolled in the SafeOpt program operated by AddShoppers; any officers and directors of Defendants; Class Counsel; and the judicial officers presiding over this action and the members of their immediate family and judicial staff.

74.    This action satisfies all the relevant requirements of Rule 23.

75.    Members of the class and subclass are so numerous that their individual joinder is impracticable. On information and belief, members of the class and subclass number in the millions. The precise number of class members and their identities is unknown to Plaintiffs at this time but may be determined through discovery. Members of the class may be notified of the pendency of this action by mail or publication through the distribution records of Defendants.

76.     Common questions of law and fact exist as to all members of the class and subclass and predominate over questions affecting only individual class members. Common legal and factual questions include but are not limited to whether Defendants have violated the Pennsylvania Wiretap Act or whether they violated California Invasion of Privacy Act (CIPA), Cal. Penal Code § 631, and whether class members are entitled to actual or statutory damages for those violations.

77.     Plaintiffs' claims are typical of the claims of the class because the Plaintiffs, like all other members of the class, visited websites of members in the Data Co-Op and had their electronic communications intercepted and disclosed to AddShoppers through AddShoppers' illegal wiretaps.

78.     Plaintiffs are adequate representatives of the class because their interests do not conflict with the interests of the members of the class they seek to represent, they have retained competent counsel experienced in prosecuting class actions, and they intend to prosecute this action vigorously. The interests of members of the class will be fairly and adequately protected by Plaintiff and their counsel.

79.     The class mechanism is superior to other available means for the fair and efficient adjudication of the class members' claims. Each individual class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendants' liability. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. Individualized litigation also presents a potential for inconsistent or contradictory judgments. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and

comprehensive supervision by a single court on the issue of Defendants' liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

80.      Plaintiffs bring all claims individually and on behalf of members of the class against Defendants.

### COUNT 1
**Violation of the Pennsylvania Wiretapping and Electronic Surveillance Control Act, 18 Pa. C.S. § 5701, *et seq*.**
**(On behalf of the Class against Nutrisystem, or in the alternative, on behalf of the Pennsylvania Subclass against Nutrisystem)**

81.      Plaintiffs repeat and reallege all preceding paragraphs.

82.      Plaintiff Ingrao brings this claim individually and on behalf of a nationwide class against Nutrisystem—a company headquartered in Pennsylvania.

83.      The Pennsylvania Wiretap Act prohibits: (1) the intentional interception or procurement of another to intercept any wire, electronic, or oral communication; (2) the intentional disclosure of the contents of any wire, electronic, or oral communication that the discloser knew or should have known was obtained through the interception of a wire, electronic, or oral communication; and (3) the intentional use of the contents of any wire, electronic, or oral communication that the discloser knew or should have known was obtained through the interception of a wire, electronic, or oral communication. 18 Pa. Cons. Stat. § 5703.

84.      Any person who intercepts, discloses, or uses or procures any other person to intercept, disclose, or use, a wire, electronic, or oral communication in violation of the Pennsylvania Wiretap Act is subject to a civil action for (1) actual damages, not less than liquidated damages computed at the rate of $100/day for each violation or $1,000, whichever is higher; (2)

punitive damages; and (3) reasonable attorneys' fees and other litigation costs incurred. 18 Pa. Cons. Stat. § 5725(a).

85.     "Intercept" means any "[a]ural or other acquisition of the contents of any wire, electronic or oral communication through the use of any electronic, mechanical or other device." 18 Pa. Cons. Stat. § 5702.

86.     "Contents" means "any information concerning the substance, purport, or meaning of that communication." 18 Pa. Cons. Stat. § 5702.

87.     "Person" means "any individual, partnership, association, joint stock company, trust or corporation." 18 Pa. Cons. Stat. § 5702.

88.     "Electronic Communication" means "[a]ny transfer of signs, signals, writing, images, sounds, data or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photo-optical system." 18 Pa. Cons. Stat. § 5702.

89.     Because Nutrisystem is a corporation, it is a person under the Pennsylvania Wiretap Act.

90.     Tracking cookies are a "device" used for the "acquisition of the contents of any wire, electronic, or oral communication" under the Pennsylvania Wiretap Act.

91.     Plaintiff Ingrao and class members' intercepted web browsing are contents of electronic communications under the Pennsylvania Wiretap Act.

92.     Defendants Nutrisystem intentionally procures and embeds AddShoppers' SafeOpt tracking technology on its websites to secretly intercept its website visitors' electronic communications with its website in real time.

93.     Plaintiff Ingrao and class members' electronic communications are intercepted at the same time as their transmission.

94.     Plaintiff Ingrao and class members did not consent to having their website communications wiretapped.

95.     Under the Pennsylvania Wiretap Act, Plaintiff Ingrao and class members seek: (1) actual damages, not less than liquidated damages computed at the rate of $100/day for each violation or $1,000, whichever is higher; (2) punitive damages; and (3) reasonable attorneys' fees and other litigation costs incurred.

## **COUNT 2**
**Violation of the Pennsylvania Wiretapping and Electronic Surveillance Control Act, 18 Pa. C.S. § 5701, *et seq*.**
**(On behalf of the Pennsylvania Subclass against Defendant AddShoppers)**

96.     Plaintiffs repeat and reallege all preceding paragraphs.

97.     Plaintiff Pacana brings this claim individually and on behalf of the Pennsylvania Subclass against Defendant AddShoppers.

98.     The Pennsylvania Wiretap Act prohibits: (1) the intentional interception or procurement of another to intercept any wire, electronic, or oral communication; (2) the intentional disclosure of the contents of any wire, electronic, or oral communication that the discloser knew or should have known was obtained through the interception of a wire, electronic, or oral communication; and (3) the intentional use of the contents of any wire, electronic, or oral communication that the discloser knew or should have known was obtained through the interception of a wire, electronic, or oral communication. 18 Pa. Cons. Stat. § 5703.

99.     Any person who intercepts, discloses, or uses or procures any other person to intercept, disclose, or use, a wire, electronic, or oral communication in violation of the

Pennsylvania Wiretap Act is subject to a civil action for (1) actual damages, not less than liquidated damages computed at the rate of $100/day for each violation or $1,000, whichever is higher; (2) punitive damages; and (3) reasonable attorneys' fees and other litigation costs incurred. 18 Pa. Cons. Stat. § 5725(a).

100.    "Intercept" means any "[a]ural or other acquisition of the contents of any wire, electronic or oral communication through the use of any electronic, mechanical or other device." 18 Pa. Cons. Stat. § 5702.

101.    "Contents" means "any information concerning the substance, purport, or meaning of that communication." 18 Pa. Cons. Stat. § 5702.

102.    "Person" means "any individual, partnership, association, joint stock company, trust or corporation." 18 Pa. Cons. Stat. § 5702.

103.    "Electronic Communication" means "[a]ny transfer of signs, signals, writing, images, sounds, data or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photo-optical system." 18 Pa. Cons. Stat. § 5702.

104.    Because AddShoppers is a corporation, it is a person under the Pennsylvania Wiretap Act.

105.    Tracking cookies are a "device" used for the "acquisition of the contents of any wire, electronic, or oral communication" under the Pennsylvania Wiretap Act.

106.    Plaintiff Pacana and class members' intercepted web browsing are contents of electronic communications under the Pennsylvania Wiretap Act.

107.    Through contracts, Defendant AddShoppers installs SafeOpt tracking technology on partner websites, which secretly intercepts visitors' electronic communications with the websites in real time.

108.    Plaintiff Pacana and class members' electronic communications are intercepted at the same time as their transmission.

109.    Plaintiffs Pacana and class members did not consent to having their website communications wiretapped.

110.    Under the Pennsylvania Wiretap Act, Plaintiffs and class members seek: (1) actual damages, not less than liquidated damages computed at the rate of $100/day for each violation or $1,000, whichever is higher; (2) punitive damages; and (3) reasonable attorneys' fees and other litigation costs incurred.

**COUNT 3**
**Violation of the Pennsylvania Wiretapping and Electronic Surveillance Control Act,**
**18 Pa. C.S. § 5701, *et seq*.**
**(On behalf of the Pennsylvania Subclass against Defendant Vivint)**

111.    Plaintiffs repeat and reallege all preceding paragraphs.

112.    Plaintiff Pacana brings this claim individually and on behalf of the Pennsylvania Subclass against Defendant Vivint.

113.    The Pennsylvania Wiretap Act prohibits: (1) the intentional interception or procurement of another to intercept any wire, electronic, or oral communication; (2) the intentional disclosure of the contents of any wire, electronic, or oral communication that the discloser knew or should have known was obtained through the interception of a wire, electronic, or oral communication; and (3) the intentional use of the contents of any wire, electronic, or oral

communication that the discloser knew or should have known was obtained through the interception of a wire, electronic, or oral communication. 18 Pa. Cons. Stat. § 5703.

114.    Any person who intercepts, discloses, or uses or procures any other person to intercept, disclose, or use, a wire, electronic, or oral communication in violation of the Pennsylvania Wiretap Act is subject to a civil action for (1) actual damages, not less than liquidated damages computed at the rate of $100/day for each violation or $1,000, whichever is higher; (2) punitive damages; and (3) reasonable attorneys' fees and other litigation costs incurred. 18 Pa. Cons. Stat. § 5725(a).

115.    "Intercept" means any "[a]ural or other acquisition of the contents of any wire, electronic or oral communication through the use of any electronic, mechanical or other device." 18 Pa. Cons. Stat. § 5702.

116.    "Contents" means "any information concerning the substance, purport, or meaning of that communication." 18 Pa. Cons. Stat. § 5702.

117.    "Person" means "any individual, partnership, association, joint stock company, trust or corporation." 18 Pa. Cons. Stat. § 5702.

118.    "Electronic Communication" means "[a]ny transfer of signs, signals, writing, images, sounds, data or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photo-optical system." 18 Pa. Cons. Stat. § 5702.

119.    Because Vivint is a corporation, it is a person under the Pennsylvania Wiretap Act.

120.    Tracking cookies are a "device" used for the "acquisition of the contents of any wire, electronic, or oral communication" under the Pennsylvania Wiretap Act.

121.    Plaintiff Pacana and class members' intercepted web browsing are contents of electronic communications under the Pennsylvania Wiretap Act.

122.    Defendant Vivint intentionally procures and embeds AddShoppers' SafeOpt tracking technology on their websites to secretly intercept their website visitors' electronic communications with its website in real time.

123.    Plaintiff Pacana and class members' electronic communications are intercepted at the same time as their transmission.

124.    Plaintiff Pacana and class members did not consent to having their website communications wiretapped.

125.    Under the Pennsylvania Wiretap Act, Plaintiff Pacana and class members seek: (1) actual damages, not less than liquidated damages computed at the rate of $100/day for each violation or $1,000, whichever is higher; (2) punitive damages; and (3) reasonable attorneys' fees and other litigation costs incurred.

### COUNT 4
**Violation of the California Invasion of Privacy Act,**
**Cal. Penal Code § 631**
**(On behalf of the California Subclass against Defendant**
**Nutrisystem)**

126.    Plaintiffs repeat and reallege all preceding paragraphs.

127.    Plaintiff Ingrao brings this claim individually and on behalf of the California Subclass against Defendant Nutrisystem.

128.    To establish liability under Cal. Penal Code Section 631(a), Plaintiff need only establish that AddShoppers, "by means of any machine, instrument, contrivance, or in any other manner," did any of the following:

    i. Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system;

    ii. Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state;

    iii. Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained; or

    iv. Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

129.    Section 631(a) applies to "new technologies" such as computers, the internet, and email.[25]

130.    AddShoppers' software, including its SafeOpt service, is a "machine, instrument, contrivance, or . . . other manner" used to engage in the prohibited conduct here.

131.    At all relevant times, by using AddShoppers' technology, AddShoppers willfully and without the consent of all parties to the communication, or in any unauthorized manner, read or attempted to read or learn the contents or meaning of electronic communications of Plaintiff Ingrao and putative class members, while the electronic communications were in transit or passing over any wire, line or cable or were being sent from or received at any place within California.

---

[25] *See Matera v. Google Inc.*, 2016 WL 8200619, at \*21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *Bradley v. Google, Inc.*, 2006 WL 3798134, at \*5-6 (N.D. Cal. Dec. 22, 2006) (CIPA governs "electronic communications"); *In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589 (9th Cir. 2020) (reversing dismissal of CIPA and common law privacy claims based on Facebook's collection of consumers' Internet browsing history).

132.    By embedding AddShoppers' technology on its website, Defendant Nutrisystem aided, agreed with, employed, and conspired with AddShoppers to carry out the wrongful conduct alleged. *See* Cal. Penal Code § 31.

133.    Plaintiff Ingrao and members of the California Subclass did not consent to any websites' actions in implementing AddShoppers' wiretaps on the websites. Nor have either Plaintiff or class members consented to Defendants' intentional access, interception, reading, learning, recording, and collection of Plaintiffs' and class members' electronic communications.

134.    Plaintiff Ingrao and members of the California Subclass seek all relief available under Cal. Penal Code § 637.2, including injunctive relief and statutory damages of $5,000 per violation.

## COUNT 5
### Violations of California Penal Code § 502,
### Computer Access and Data Fraud Act (CDAFA)
### (On behalf of the California Subclass against Defendants AddShoppers and Nutrisystem)

135.    Plaintiffs repeat and reallege all preceding paragraphs.

136.    Plaintiff Ingrao brings this claim individually and on behalf of the California Subclass against Defendants AddShoppers and Nutrisystem.

137.    AddShoppers violated Cal. Penal Code § 502(c)(2) by knowingly and without permission accessing, taking and using Plaintiffs' and the class members' personally identifiable information.

138.    AddShoppers accessed, copied, used, made use of, interfered with, or altered data belonging to Plaintiff and class members: (1) in and from the State of California; (2) in the states in which Plaintiff and the class members are domiciled; and (3) in the states in which the servers

that provided services and communication links between Plaintiff Ingrao and the class members and AddShoppers and other websites with which they interacted were located.

139.    Cal. Penal Code § 502 provides: "For purposes of bringing a civil or a criminal action under this section, a person who causes, by any means, the access of a computer, computer system, or computer network in one jurisdiction from another jurisdiction is deemed to have personally accessed the computer, computer system, or computer network in each jurisdiction."

140.    AddShoppers has violated California Penal Code § 502(c)(1) by knowingly and without permission altering, accessing, and using Plaintiff and class members' personally identifiable data to execute a scheme to defraud consumers by using and profiting from the sale of their personally identifiable data, thereby depriving them of the value of their personally identifiable data.

141.    AddShoppers has violated California Penal Code § 502(c)(6) by knowingly and without permission providing, or assisting in providing, a means of accessing Plaintiff's and class members' computer systems or computer networks.

142.    AddShoppers has violated California Penal Code § 502(c)(7) by knowingly and without permission accessing, or causing to be accessed, Plaintiff's and class members' computer systems or computer network.

143.    Under California Penal Code § 502(b)(10), a "Computer contaminant" is defined as "any set of computer instructions that are designed to . . . record, or transmit information within computer, computer system, or computer network without the intent or permission of the owner of the information."

144.    AddShoppers has violated California Penal Code § 502(b)(8) by knowingly and without permission introducing a computer contaminant into the transactions between Plaintiff and the class members and websites; specifically, a "cookie" that intercepts and gathers information concerning Plaintiff's and the class members' interactions with certain websites, which information is then transmitted back to AddShoppers.

145.    By embedding AddShoppers' technology on its website, Defendant Nutrisystem aided, agreed with, employed, and conspired with AddShoppers to carry out the wrongful conduct alleged. *See* Cal. Penal Code § 31.

146.    As a direct and proximate result of AddShoppers' unlawful conduct under California Penal Code § 502, AddShoppers has caused loss to Plaintiff and the class members in an amount to be proven at trial. Plaintiff and the class members are also entitled to recover their reasonable attorneys' fees under California Penal Code § 502(e).

147.    Plaintiff and the class members seek compensatory damages, in an amount to be proven at trial, and declarative or other equitable relief.

148.    Plaintiff and the class members are entitled to punitive or exemplary damages under Cal. Penal Code § 502(e)(4) because AddShoppers' violations were willful and, upon information and belief, AddShoppers is guilty of oppression, fraud, or malice as defined in Cal. Civil Code § 3294.

## PRAYER FOR RELIEF

For all the reasons above, Plaintiffs request that the Court:

    i.      Certify this action as a class action for all counts;

ii.    Appoint Plaintiffs as class representatives and appoint their attorneys as class counsel;

iii.    Award injunctive relief;

iv.    Award compensatory, nominal, punitive, and statutory damages in amounts to be determined by the Court or jury;

v.    Award reasonable attorney' fees and costs;

vi.    Award prejudgment interest on all amounts awarded; and

vii.    Grant such further relief that the Court deems necessary and proper.

## <u>DEMAND FOR TRIAL BY JURY</u>

Plaintiffs demand a trial by jury of all issues that are triable.

Dated: March 8, 2024                    Respectfully submitted,

By: <u>/s/ *Charles E. Schaffer*</u>
Charles E. Schaffer
Nicholas J. Elia
**LEVIN SEDRAN & BERMAN LLP**
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Telephone: (215) 592-1500
cschaffer@lfsblaw.com
nelia@lfsblaw.com

Norman E. Siegel (*pro hac vice* forthcoming)
J. Austin Moore (*pro hac vice* forthcoming)
Kasey Youngentob (*pro hac vice* forthcoming)
**STUEVE SIEGEL HANSON LLP**
460 Nichols Road, Suite 200
Kansas City, Missouri 64112
(816) 714-7100 (tel.)
siegel@stuevesiegel.com
moore@stuevesiegel.com
youngentob@stuevesiegel.com

*Attorneys for Plaintiffs and the Class*